**ÆTNA CASUALTY & SURETY CO. v. KISHWAUKEE SPECIAL DRAINAGE DIST.**

No. 8406.

Circuit Court of Appeals, Seventh Circuit.

May 20, 1944.

Rehearing Denied July 17, 1944.

EVANS, Circuit Judge, dissenting.

———◆———

Floyd E. Thompson, Henry J. Brandt, and Frank T. Jordan, all of Chicago, Ill., and Dennis J. Collins and Harold E. Mann, both of DeKalb, Ill. (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for appellant.

De Goy B. Ellis and Paul M. Hamilton, both of Elgin, Ill. (Ellis, Hamilton, Jordan & Geister, of Elgin, Ill., of counsel), for appellee.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a summary judgment, entered April 16, 1943, upon plaintiff's motion, in the amount of $22,913.24. The judgment rests solely upon plaintiff's right of subrogation to seven named judgment creditors (herein referred to as the Masterson creditors), who obtained their judgments against the defendant in the Circuit Court of DeKalb County, Illinois, March 12, 1923. The judgment in the instant case requires, in the event no funds are available for its satisfaction, that defendant "by its officers, agents and servants, shall proceed forthwith to levy a Special Assessment against the lands within said District" for an amount sufficient to pay the judgment, together with interest thereon from the date of its entry.

The judgment is attacked upon numerous grounds, but we are of the view that the important and controlling questions are: (1) Was plaintiff entitled to be subrogated to the rights of the Masterson judgment creditors? and (2) Even so, was it as such subrogee entitled to a judgment, satisfaction of which could be forced by a special assessment levy?

Defendant was organized as a special drainage district under the provisions of the Illinois "Farm Drainage Act," Chap. 42, Sec. 134 et seq., Ill.Rev.Stats.1941. Under the Act, the affairs of the district are conducted by three commissioners elected by the landowners, the county clerk of the county in which the land is located is ex-officio clerk of the district, and the county treasurer is ex-officio treasurer thereof. On July 1, 1908, the district issued its bonds made payable solely out of special assessments to be collected. These assessments were collected but not used in payment of the bonds. (The record fails to disclose for what purpose such assessments were used.) On March 12, 1923, the Masterson creditors, being bondholders of the 1908 issue, obtained the judgments to which plaintiff was awarded subrogation. No execution was issued upon such judgments and they were not satisfied of record until October 1942.

On October 1, 1923, another special assessment was levied against the landowners of the district, purportedly for the purpose of repairing ditches. Bonds were issued in anticipation of the collection of such special assessments, which also were payable solely from such assessments to be collected. Interest on such bonds was paid until January 1, 1924, but neither principal nor interest was paid thereafter. On October 25, 1923, this second bond issue was sold and delivered to W. W. Armstrong Co., and the proceeds thereof deposited by one Decker, the treasurer, to the credit of the district. On October 29, 1923, from the funds thus realized, the treasurer paid the 1908 bonds (those upon which the Masterson judgments were predicated). The bonds thus sold to Armstrong were subsequently acquired by a group of persons referred to as the Adamson creditors.

These latter creditors, on August 22, 1929, filed an equity suit in the United States District Court, Cause No. 9306, naming the defendant, its treasurer Decker, and three commissioners as parties defendant, wherein they sought to recover the purchase price paid for such bonds on the ground that the proceeds thereof had been unlawfully and illegally used in payment of the Masterson bonds (issue of 1908). A decree in this case was entered January 29, 1932 by Judge Wilkerson, in which the Adamson creditors were awarded judgment against defendant in the sum of $5,237.49, and against the treasurer Decker and the commissioners in the amount of $18,758.06. The judgment against defendant was paid from the proceeds on hand from the sale of the second bond issue. (As already noted, the balance of the proceeds of this issue had been diverted to the payment of the Masterson creditors.) The treasurer Decker having defaulted on the judgment against him, the Adamson creditors, on June 7, 1932, filed suit in the District Court against him and his surety (plaintiff in the instant suit). Judgment was entered against such defendants, and on October 14, 1934, plaintiff paid the sum which had theretofore been found in Cause No. 9306 due and owing from the treasurer to the Adamson creditors. Thus the judgment in Cause No. 9306 was fully satisfied, by the district as to the judgment against it and by the surety company as to the judgment against Decker.

On July 17, 1937, plaintiff instituted the present action against Decker to recover the amount it had been forced to pay on his account. On November 25, 1938, an additional count was filed against the instant defendant, by which plaintiff sought to be subrogated to the claims of the Masterson judgment creditors whose bonds, as heretofore related, had been paid and cancelled on October 29, 1923, although the judgments predicated thereon remained unsatisfied. This appeal, as already shown, comes from the summary judgment entered upon plaintiff's cause as stated in this additional count.

█ We find ourselves in some difficulty attempting to understand plaintiff's theory as to its right of subrogation. Under any ordinary accepted meaning of this equitable doctrine, plaintiff, upon paying the judgment in favor of the Adamson creditors in Cause 9306, was subrogated to the rights of such creditors. Defendant, however, as already shown, paid the judgment, or the portion of the judgment, which was rendered against it, and plaintiff's liability was confined solely to the judgment against its principal, Decker. True, it is contended by the plaintiff that the rights of the Adamson creditors against defendant were not adjudicated in Cause 9306. The record refutes such contention. Defendant in the instant suit was a defendant there, and not only does the decree award a judgment in a specific amount against it (limited to the unexpended proceeds realized from the sale of the Adamson bonds), but the court specifically concluded that the defendant (drainage district) "lacks authority and warrant in law to levy an additional tax or assessment for the purpose of supplying a sufficient fund in its treasury to pay and discharge the residual balance due on the indebtedness above stated." This judgment, unappealed from, is a final adjudication that the district had no further liability to the Adamson creditors. The rights of the latter against the district having thereby been extinguished, plaintiff acquired no rights against it by paying the judgment against Decker.

Plaintiff advances the theory that the Adamson creditors were subrogated to the rights of the Masterson creditors in the judgments obtained by the latter and that such rights were included in those which it acquired from the Adamson creditors. This theory embraces the novel idea that plaintiff took from Adamson by subrogation a right which Adamson took from Masterson by the same process. It involves subrogation upon subrogation. We are cited no authority and we find none where the prin-

ciple has been thus extended. Furthermore, such a theory if accepted would avail the plaintiff nothing, for the reason, as already pointed out, that the claims of the Adamson creditors against the district had been reduced to judgment and paid. Therefore, they had no further rights against the district by subrogation or otherwise.

Plaintiff has another theory, more plausible perhaps but equally as novel, which it evolves from the fact that it became liable to the Adamson creditors because the proceeds realized from the Adamson bonds were wrongfully diverted to the payment of the Masterson bonds. Thus in legal effect, so it is argued, its funds and not those of the district have been utilized in payment of the Masterson creditors. This appears to have been the basis for the judgment appealed from. At any rate, the decree gives plaintiff the right to be subrogated directly to the rights of the Masterson creditors. As already pointed out, the Masterson bondholders were paid in 1923, and plaintiff discharged its liability to the Adamson creditors October 14, 1934. While it may be true that plaintiff would not have become liable except for the wrongful diversion of funds for the purpose of paying the Masterson creditors, it does not follow that its funds were used for that purpose. Furthermore, plaintiff was in no sense involved in or related to any transaction between the Masterson creditors and the district or its officers, nor did it sustain any relation of privity to such parties. None of the elements existed upon which subrogation could be predicated. Cf. Dunlap v. Peirce, 336 Ill. 178, 190, 168 N.E. 277, 66 A.L.R. 181. If it acquired any rights in the claims of the Masterson creditors, it must have been via the Adamson creditors for whose benefit it was required to pay. As already shown, however, there was nothing it could acquire by the latter route for the reason that the Adamson claims against the district were reduced to judgment and satisfied. Again, no authority is cited in support of this direct subrogation theory and, in our judgment, it cannot be accepted.

Assuming, however, that plaintiff is entitled to be subrogated to the rights of the Masterson creditors, it is still confronted with an insurmountable barrier. If plaintiff is entitled to such right, the question inevitably arises as to what rights it acquired thereby, the answer to which is dependent upon the rights of the Masterson creditors against the district. The several judgments in favor of the Masterson creditors were general in nature and predicated upon special assessment bonds which contained a specific provision that they were a lien solely upon special assessments to be collected thereafter. Could these judgment creditors have enforced such judgments against the district? If not, they could not have been enforced by plaintiff as subrogee. Plaintiff appears to think that any discussion of these judgments amounts to a collateral attack upon their validity, which is not permissible. While the circumstances under which they were entered give rise to a fair inference that they amounted to a fraud upon the district, we need not consider or decide their validity. Assuming their validity, the judgment creditors acquired an empty right unless such judgments were susceptible of enforcement, or, in other words, unless the district could be compelled by legal process to satisfy them.

A drainage district organized under the Act in question is authorized to raise funds only by special assessment. The landowners of this district had once been assessed for the purpose of paying the bonds upon which these judgments rest, and it is settled law of Illinois, so we think, that such landowners cannot again be assessed for the same purpose. This court so decided in Turner v. Hunt Drainage District, 7 Cir., 87 F.2d 167, wherein, page 168, we stated:

"When lands have been once assessed for the benefit that will accrue to them by virtue of an improvement, they cannot be re-assessed for the same improvement, regardless of whether the money arising from the assessment was used for that improvement or some other improvement or purpose."

Again, on page 169 of 87 F.2d, it was said:

"The law required that their land be subjected to an assessment sufficient to pay the cost of the improvements, including the bridges. That was done. Bonds were issued and sold for a sufficient amount to cover the assessments, and the money was placed in the hands of the commissioners of the district. Through theft, or some other more dignified form of felonious conduct which the record does not disclose, the money has disappeared. Under these circumstances, neither the law nor good morals obligates the land owners of the district to be subjected to the payment of twice the amount of their benefits."

The law is aptly stated in Badger v. Inlet Drainage District, 141 Ill. 540, page 545, 31 N.E. 170, 171, wherein the court stated:

"Although we have held that a drainage district is to be classed as a municipal corporation, (Commissioners v. Kelsey, 120 Ill. 482, 11 N.E. 256,) yet we have also held that such a district is organized merely for a special and limited purpose; that its powers are restricted to such as the legislature has deemed essential for the accomplishment of such purpose; and that it is only authorized to raise funds for the specific object for which it is formed; and that it can do that in no other mode than by special assessments upon the property benefited, which can, in no case, exceed the benefits to the lands assessed."

See also Elmore v. Drainage Commissioners, 135 Ill. 269, 25 N.E. 1010, 25 Am. St.Rep. 363; Ahrens v. Minnie Creek Drainage District, 170 Ill. 262, 48 N.E. 971; Drainage Commissioners v. Kinney, 233 Ill. 67, 84 N.E. 34; Barton v. Minnie Creek Drainage District, 112 Ill.App. 640.

Plaintiff relies upon a number of later decisions of the Illinois courts, which it contends repudiate the earlier rule. Bradbury v. Vandalia Levee & Drainage District, 236 Ill. 36, 86 N.E. 163, 19 L.R.A., N.S., 991, 15 Ann.Cas. 904; Farrow v. Eldred Drainage and Levee District, 359 Ill. 347, 194 N.E. 515; Eldred Drainage & Levee District v. Wilcoxson, 365 Ill. 249, 6 N.E.2d 149; People v. Village of Bradley, 367 Ill. 301, 11 N.E.2d 415, and Bates v. Drainage Commissioners, 273 Ill.App. 335. We have studied these cases and do not agree with plaintiff's contention. Most, if not all, of them have to do with damage to property occasioned by the authorized acts of the officers of the district, in contrast to the unauthorized acts of such officers as is the situation in the instant case. Such distinction is recognized in the Bradbury case, where on page 46 of 236 Ill., on page 166 of 86 N.E., 19 L.R.A.,N.S., 991, 15 Ann.Cas. 904, the court stated, "Undoubtedly a drainage district is not liable for the unauthorized acts of its commissioners for which they are personally liable * * *," and then proceeded to sustain a judgment for damages occasioned by the authorized acts of the drainage commissioners.

In the Farrow case, the Supreme Court approved the award of a writ of mandamus against the district to levy and collect a special assessment for the purpose of satisfying a judgment theretofore obtained against the district. In conformity with such decision, an assessment proceeding was had in the County Court. An appeal from this proceeding was decided by the Supreme Court in the Wilcoxson case. It is disclosed that the original judgment was for damages occasioned by an overflow of water resulting from the district's improvements. The decision rests squarely upon the proposition that the landowners of the district had received the benefit of that which constituted a damage to the plaintiff's property. In thus resting its decision, the court (page 251 of 365 Ill., 11 N.E.2d 415) distinguished its former decision in North Wichert Drainage District v. Merritt Chamberlain et al., 340 Ill. 644, 173 N.E. 90, 92, wherein it was held:

"It is, of course, true that no land can be assessed for the cost of any improvement more than it is benefited by the improvement, and, if it is not benefited, it cannot be assessed for any amount."

In the Bates case, it was held that the district was liable for damages occasioned by the negligence of its employee engaged in burning weeds along the drainage district. The only defense interposed was that the district was immune from liability for the negligence of its agents. In our view, this furnishes little, if any, support to the contention that a drainage district is liable for the misconduct of its officers in diverting funds to a purpose unauthorized by law. Especially is this true in view of the numerous cases in which the opposite rule has been applied.

In the Bradley case, mandamus was allowed against the village to compel the payment of certain judgments. It has no relevancy to the instant situation for the reason that the powers of a village with reference to taxation are not limited as are those of a drainage district, especially one organized under the "Farm Drainage Act." Even so, however, the court pointed out (page 307 of 367 Ill., page 419 of 11 N.E.2d):

"The writ of mandamus awarded directs, in substance, that the village levy the maximum tax authorized by law, and, after first providing for the most economical expenses of the village, pay the surplus to the relators on their judgments."

Thus, in none of the cases relied upon by plaintiff has liability been imposed upon a drainage district for the unauthorized and unlawful acts of its officers. We therefore

conclude that our decision in Turner v. Hunt Drainage Dist., supra, is in conformity with the controlling rule in Illinois. It follows that even though plaintiff was subrogated to the rights of the Masterson creditors, and this we have decided to the contrary, the judgment in the instant case which directed the levy of a special assessment against the lands in said district is invalid.

The judgment of the District Court is, therefore, reversed.

EVANS, Circuit Judge (dissenting).

Two questions are presented: (a) Should the court subrogate plaintiff to the rights of the Masterson judgment creditors? (b) What are the rights of said judgment creditors as against the Drainage District? The District Court not only held plaintiff to be entitled to subrogation, but ordered an assessment of land in the District to pay the plaintiff's claim. I think that the two questions are quite separate and in no way interdependent.

To better picture the status of the parties, the following is submitted as

A Chronological Statement of the Important Events:

(1) In 1906 The Kishwaukee Special Drainage District was organized.

(2) July 1, 1908 The District issued bonds aggregating $27,000, here termed the Masterson bonds, which were to mature, July 1, 1918.

(3) March 12, 1923 Seven judgments totaling $16,024 were recovered in the state court, against the District, in favor of the Masterson bondholders.

(4) October 15, 1923 Another issue of bonds, $16,200, called the Adamson bonds, was issued. They were special, limited liens payable out of assessments to be collected.

(5) October 25, 1923 The Adamson bonds were sold to Armstrong Co. for $15,740.99.

(6) October 29, 1923 The District Treasurer paid the first issue of bonds, the Masterson bonds, out of moneys received from the sale of the Adamson bonds.

(7) In 1926 The state court sustained objections to further assessments under the Adamson issue. Up to that time $6,574.25 had been collected on such assessments.

(8) August 22, 1929 Adamson and other holders of the 1923 issue sued the District, the Treasurer, and its commissioners for misapplication of the funds received on the sale of their bonds.

(9) January 29, 1932 The Adamson suit resulted in a judgment in favor of Adamson, et al., against the District, in the sum of $5,237.49, and against the Treasurer and the commissioners for $18,758.06. The District paid its judgment.

(10) June 7, 1932 Adamson, et al., filed suit on their judgment against the surety of Decker, the Treasurer.

(11) October 14, 1934 Adamson, et al., recovered judgment against the surety (the instant plaintiff) and said judgment of $18,758.06 was paid by the surety.

(12) April 23, 1937 The surety, instant plaintiff, as subrogee of Adamson, sued the Treasurer, in state court on fieri facias, returned no property found.

(13) July 17, 1937 Instant suit begun, by surety against District.

(14) November 25, 1938 Surety filed new count seeking to be subrogated to Masterson bonds.

(15) February 26, 1941 The Treasurer paid the surety company, $3,250 on account.

(16) October, 1942 Masterson bonds satisfied of record.

(17) April 16, 1943 Instant judgment, subrogating surety to the Masterson creditors and to recover $22,913.24 against the District, and if it did not have the funds on hand, ordered the District to levy a special assessment against the lands.

Event No. 11 is the basis of plaintiff's cause of action. It paid a judgment of $18,780.19, as surety of the treasurer of the District, who erroneously used moneys derived from sale of the Adamson bonds to pay the holders of the Masterson bonds. The Masterson bonds thus satisfied were legal obligations of the District for which judgment had been entered (See event No. 3). The judgments were not satisfied of record until October, 1942 (see event No. 16). The legal effect of the payment, however, was to satisfy the debt evidenced by the bonds and the state court judgments based on them.

The mistake of the treasurer whereby he used funds lawfully devotable solely to the payment of Adamson bondholders, to the payment of the lawfully-issued Masterson bonds, created a liability on the part of the treasurer for which the surety was liable. The treasurer not being financially able to

meet the District's demand to make good on his misapplication of the District's funds to the wrong obligation of the District, the surety company was called upon to pay and did pay the said obligation of its principal.

What right, if any, did it thereby become subrogated to? That is our question.

Undoubtedly plaintiff became subrogated to the principal's rights, to the rights of the treasurer of the District. American Surety Co. v. Bethlehem Bank, 314 U.S. 314, 317, 62 S.Ct. 226, 86 L.Ed. 241, 138 A.L.R. 509. The principal had paid the Masterson bondholders, whose claims were then reduced to judgment against the District. Had the treasurer, instead of the surety, paid this money to the District, would he not have been entitled to be subrogated to the Masterson judgment creditors' claims? I think so. It seems to me that the surety would have the same right to subrogation as its principal.

It has been said (50 Am.Juris. pp. 683–685) that "Subrogation is a creature of equity, having for its purpose the working out of an equitable adjustment and the doing of complete and perfect justice between the parties. (Restatement of the Law—Restitution Sec. 162.) * * * It is the machinery by which the equities of one man are worked out through the legal rights of another; a legal fiction through which one person who pays the debt of another, not as a volunteer, is put into the shoes of the creditor, thereby becoming entitled to the latter's rights, priorities, remedies, liens, and securities."

"It is not static, but is sufficiently elastic to take within its remedy cases of first instance which fairly fall within it."

The doctrine of subrogation found its most frequent application, in the earlier cases, to instances where sureties made good the default of their principals. Its application in this case cannot be questioned. Only the extent to which it should be carried is debatable.

Defendant disputes plaintiff's right to step into the shoes of the Masterson bondholders, because to so hold would be carrying subrogation further than permissible. The majority opinion so holds. I think otherwise.

The rule is well recognized that a surety entitled to subrogation is entitled not only to the rights and remedies of the creditor against the principal, but may also be subrogated to the rights and remedies of the creditor against third persons. The right to recover from third persons, however, does not stand on the same footing as the right to recover from the principal. As against the principal, the right is absolute. As against the third party, it is conditional. Against the third party the right will usually be enforced, but not if innocent purchasers' or innocent third parties' rights are thereby impaired. See Amer.Juris. page 754.

In the instant case, no third parties' rights have intervened. Plaintiff paid an obligation of its principal which arose because said principal paid the claims of bondholders from funds of the Drainage District, which were only usable for another purpose.

To hold that the surety's right to subrogation extends only to a cause of action against the principal would give to this equitable doctrine a scope inconsistent with the spirit of equity out of which it grew. Payment by the principal was payment of a valid obligation of the Drainage District. In fact, the obligation, evidenced by bonds of the District, had been reduced to a judgment. Its legality could not be assailed, although its enforceability presents a different question.

It is quite beside the question to say that the holder of the bonds or the holder of the judgment could not enforce the judgment in the usual way, by assessment. We are here merely considering the right of subrogation. Whether that right will prove valuable raises a different question.

It is hardly necessary to add that I am of the opinion that plaintiff was subrogated to the rights of the Masterson bondholders, whose claims were paid by the District's treasurer on whose bond the plaintiff's liability arose.

Does the record show that plaintiff, who was subrogated to the rights of the Masterson bondholders, was entitled to the decree ordering an assessment against the landowners of the District?

The instant decree was entered in a summary proceeding without a trial. The District Court only had pleadings before it. There were some disputed issues presented by these pleadings.

I am not satisfied from the record before me that an assessment should be made, nor can I say that the prayer for an assessment should be denied.

The right to compel an assessment depends upon the Illinois law as construed by the Illinois Supreme Court.

I am unable to say that there existed sufficient reason to justify refusal to order an assessment. The Masterson creditors held bonds which had been reduced to judgment, in an Illinois state court. That much is clear. But what interfered with their payment? Were the facts which prevented their payment sufficient to relieve the landowners from further assessments of their land? I am unable to say from the meager record before us.

I believe the decree should be reversed, but only as to that part which orders an assessment of land to pay plaintiff's claim. As to this issue, the District Court should hear the parties fully and make findings which bear upon, and determine, the liability of the landowners for assessment with which to pay all or part of plaintiff's claim based on its right through subrogation to enforce the Masterson bonds.